**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

|   |   |   |
|---|---|---|
| **ROBERT UPCHURCH,** | : | **Case No. 2:10-CV-1020** |
|  | : |  |
|  | : |  |
| **Plaintiff,** | : |  |
|  | : | **JUDGE ALGENON L. MARBLEY** |
| **v.** | : |  |
|  | : | **Magistrate Judge Terence P. Kemp** |
| **MOUNT CARMEL HEALTH SYSTEM,** | : |  |
|  | : |  |
| **Defendant.** | : |  |
|  | : |  |

## OPINION AND ORDER

### I. INTRODUCTION

This case comes before the Court on Defendant Mount Carmel Health System's ("Mount Carmel") Motion for Summary Judgment under Fed. R. Civ. P. 56 on all the claims asserted against it by Plaintiff Robert Upchurch.  (Dkt. 18.)   Mount Carmel contends the factual record demonstrates that there are no genuine issues of material fact on the essential elements of Upchurch' claims.  As explained more fully in its analysis herein, the Court finds that Mount Carmel has met its burden of proof, and it is entitled to judgment as a matter of law on all of Upchurch's claims. Mount Carmel's Motion for Summary Judgment is **GRANTED**, and the action is **DISMISSED.**

### II. BACKGROUND

### 1. Upchurch's Employment History at Mount Carmel

Upchurch was employed at the Mount Carmel East Hospital in Columbus, Ohio for nearly 20 years before being terminated in 2008, the events of which form the subject of this lawsuit.  Mount Carmel hired Upchurch as a staff chaplain on June 3, 1991.  (Pl. Dep. 26-27.)

As a chaplain, Upchurch's duties included "providing pastoral ministry to designated clinical areas according to standards of excellence for spiritual care established by [Mount Carmel's owner] Trinity Health." (*Id*. 34, Ex. 1.) Upchurch's primary responsibility was providing spiritual counseling to patients and families in the emergency room. (*See id*.) Unless he was called away on other official duties, Mount Carmel's expectation was that Upchurch would remain in the Emergency Department during the workday. (Pl. Dep. 36.)

Mount Carmel East's workforce included five other chaplains who were primarily assigned to other areas of the hospital. (Pl. 30-31.) Michelle Lemiesz, also a trained and certified Chaplain, was the Director of the Chaplaincy Services Department at Mount Carmel East, and was Upchurch's supervisor for the last six years of his employment. (Pl. Dep. 32-33; Lemiesz Dep. 9.) For the entire six years that Ms. Lemiesz supervised Upchurch, she knew him to be involved in alternative spiritual practices. (Lemiesz Dep. 26.) For example, Upchurch was a "holistic coach" and engaged in "energy" work, which sometimes included walking in circles. (Lemiesz Dep. 27.)

Beginning in 2007, Ms. Limiesz noticed significant changes in Upchurch's behavior. Upchurch explained to Ms. Lemiesz and other coworkers that he believed he was going through a spiritual transformation that involved his being directed by a "voice" telling him to take various actions or directions in his life. (Lemiesz Dep. 14.) Ms. Liemesz and Linda Weatherholt, an Associate Relations Manager in the Mount Carmel East Human Resources Department, received reports that certain behaviors of Upchurch were becoming disruptive in the workplace and inhibiting his job performance, including: wandering away from his assigned area in the Emergency Department; being outside of the building during working hours; talking to himself; telling others about having conversations with God or Jesus, and about Jesus directing him to do

things; and walking in circles in the Emergency Department with his eyes closed.  (Lemiesz Dep. 17; Weatherholt Dep. 10-12.)  When Ms. Lemiesz and Ms. Weatherholt addressed these issues with Upchurch, he told them that they were part of his spiritual journey.  (Pl. Dep. 51-52.)

Upchurch's erratic and disruptive behavior continued to escalate, so Ms. Weatherholt placed him on administrative leave and referred him to Mount Carmel's Employee Assistance Program ("EAP") for an evaluation.  (Pl. Dep. 52.)  The EAP was an outside, third-party program that provided services to Mount Carmel for a fee.  (Weatherholt Dep. 25.)  Through the EAP program, Upchurch met with a counselor regarding controlling his behavior. (Pl. Dep. 52.)  The EAP program arranged for Upchurch to be evaluated by an outside psychologist, Dr. David Tennenbaum, for a fitness-for-duty psychiatric evaluation.  (Pl. Dep. 55-56; Weatherholt Dep. 25.)  Dr. Tennenbaum performed a number of tests on Upchurch, and met with him on several occasions.  (Pl. Dep. 57-58.)  Dr. Tennenbaum's consultation report expresses difficulty in firmly diagnosing Upchurch, but the Axis I and Axis II test results returned a principal diagnosis of "Narcissistic Personality Disorder."  (Jnt. Dep. Ex. 12, at 5.)  Dr. Tennenbaum reported that Upchurch was very manipulative, but was not psychotic.  (*Id.*; Weatherholt Dep. 29, 61-63.)

Upchurch testified that at the time these evaluations took place, he did not believe that he was mentally ill.  (Pl. Dep. 57.)  Upchurch testified that he had no reason to doubt Dr. Tennenbaum's competence or to question his conclusions.  (Pl. Dep. 70.)  Dr. Tennenbaum referred Upchurch for additional evaluation by a colleague who specialized in alternative spirituality, but Upchurch failed to make an appointment.  (Pl. Dep. 59.)  Dr. Tennenbaum opined to Ms. Weatherholt that Upchurch could return to work at Mount Carmel and that he had the ability to follow work rules.  (Weatherholt Dep. 39; *see also* Pl. Dep. 59-60; Pl. Dep. Ex. 2.)

Upchurch returned to work at Mount Carmel after his fitness-for-duty evaluation, but Mount Carmel put a performance improvement plan in place for Upchurch (the "Plan").  (*See* Pl. Dep. 61-65, 67-68; Pl. Dep. Ex. 2.)  The Plan required Upchurch to report to the Duty Chaplain at any time he was leaving the workplace and to report to his immediate supervisor (Ms. Lemiesz) at the end of any work period.  (Pl. Dep. Ex. 2.)  The Plan further required Upchurch to cease his erratic or disruptive behavior if instructed by his supervisor, other chaplains, or other hospital employees as required, and to comply with reasonable instructions from HR or the Chaplaincy department with respect to behavior that did not meet performance standards.  (Pl. Dep. Ex. 2.)  Upchurch testified that he had every intention of complying with the Plan and believed that he was capable of complying with the Plan.  (Pl. Dep. 68-69.)  Upchurch signed the Plan on January 14, 2008.  (Pl. Dep. 62.)  Upchurch also admitted that he understood the requirements of the Plan would apply for the remainder of his employment at Mount Carmel, unless he was told otherwise, and that if he violated the expectations set out in the Plan, he could be terminated.  (Pl. Dep. 64.)

## 2.  Upchurch's Termination

On the morning of January 24, 2008, Upchurch came to work but left abruptly shortly after his arrival without talking to his immediate supervisor or reporting to the Duty Chaplain, as required by his Plan.  (Pl. Dep. 67, 72.)  Upchurch saw the Chaplain's office receptionist Collette Smith, waved his hands around, told her he had not slept all night and he "couldn't do this today," put his pager and badge in his mailbox, and left the hospital area.  (Lemiesz Tr. 72; Jnt. Dep. Ex. 21.)  Upchurch testified that he left work because he felt that he could not be around people and do his job after being up all night.  (Pl. Dep. 72-73.)  Ms. Lemiesz reported the

incident to Ms. Weatherholt, who instructed Ms. Leimesz to take a statement of the incident from Ms. Smith.

Based on the information presented to Ms. Weatherholt, i.e., the fact that Upchurch said that he could not "do this anymore," the fact that he left behind his pager and hospital ID badge, which he usually took with him and would need to enter the employee parking area if he planned to return to work, and the fact that he had not reported to his supervisor before leaving as required in his Plan, Ms. Weatherholt determined that she would terminate Upchurch from employment for abandoning his position without authorization.  (Weatherholt Dep. 52.)  Ms. Lemiesz, after repeated attempts to contact him, reached Upchurch by telephone later on January 24, 2008.  (Lemiesz Tr. 84-85.)  Upchurch asked Ms. Lemiesz for some time off work, and Ms. Lemiesz agreed that time off for him might be a good idea.  (Lemiesz Tr. 84-85.)  When Upchurch returned to work the next day, he was terminated by Ms. Weatherholt because he had walked off his job the day before.  (Weatherholt Dep. 56; *see also* Pl. Dep. 80.)

Upchurch testified that at the time of his termination, he did not believe that he was suffering from mental illness.  (Pl. Dep. 60-61.)  Upchurch admitted that during the entire course of his employment at Mount Carmel, he never reported to anyone that he had a mental illness, never asked anyone for an accommodation for any mental illness, never asked to take a leave of absence because of a mental illness, and never provided Mount Carmel with a certification from any doctor that he had a mental illness, a serious health condition, or a disability. (Pl. Dep. 61, 84.)

### 3.  Upchurch's Post-termination Mental Health Treatment

In April 2008, several months after his employment at Mount Carmel ended, Upchurch attempted to commit suicide by asphyxiating himself with car exhaust.  (Pl. Dep. 88-89.)  This

incident finally caused him, with the help of his wife, to seek psychiatric treatment as an inpatient. (*Id.* 88-89)  Upchurch began seeing Dr. Hartman, his current physician. (*Id.* 90-91.) In May 2008, Dr. Hartman diagnosed Upchurch with "schizophrenia with paranoid portion." (Pl. Dep. 87.)  Upchurch testified that between the time he left Mount Carmel and the time he started treating with Dr. Hartman, his symptoms got worse and he also began to exhibit "a different set of symptoms," including anxiety, which had not been present before.  (Pl. Dep. 96.) Upchurch began taking anti-hallucinogen medication in July 2008, and stopped hearing voices in December 2008.  (Pl. Dep. 94-95.)  By 2011, his symptoms had cleared up and he was able to start working again.  (*Id.* 98-99.)

Upchurch brought this lawsuit on November 12, 2010, approximately two years and ten months after his termination from Mount Carmel in January 2008.  Upchurch sues Mount Carmel for: (1) interference with FMLA rights under 29 U.S.C. § 2601 *et seq.*; (2) disability discrimination under Ohio Rev. Code § 4112.01 *et seq.*; and (3) wrongful termination in violation of Ohio public policy.  (Dkt. 1, Complaint ¶¶ 23–43).  On January 24, 2012, Mount Carmel moved for summary judgment, to which Upchurch responded.  In his Response to Mount Carmel's Motion for Summary Judgment, Upchurch withdrew his third claim for wrongful termination in violation of an Ohio public policy against concealment of medical facts.  (Dkt. 24, at 18.)

The motion is now fully-briefed, and oral argument has been held on Mount Carmel's motion with respect to Upchurch's remaining two claims.  The matter is ripe for determination.

### III. STANDARD OF REVIEW

A motion for summary judgment should be granted only when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law."  Fed. R. Civ. P. 56(a).  Summary judgment on a claim or issue "will not lie if the . . . evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In considering a motion for summary judgment, a court must construe the evidence in the light most favorable to the non-moving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  The movant has the burden of establishing that there is no genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388-89 (6th Cir. 1993).

A genuine issue of material fact exists "when there is sufficient evidence for a trier of fact to find for the non-moving party."  *La Quinta Corp. v. Heartland Props. LLC*, 603 F.3d 327, 335 (6th Cir. 2010); *see also Westco Group, Inc. v. K.B. & Assocs.*, 128 F. Supp. 2d 1082, 1086 (N.D. Ohio 2001) ("A factual dispute precludes summary judgment only if it is material, that is, if it relates to a matter essential to adjudication.").  To survive summary judgment, the non-moving party must present "significant probative evidence" to show that there is more than "some metaphysical doubt as to the material facts."  *Moore v. Philip Morris Co.*, 8 F.3d 335, 339–40 (6th Cir. 1993).

## IV. LAW AND ANALYSIS

### A.  Unlawful Interference with Upchurch's FMLA Rights

Upchurch claims that Mount Carmel willingly failed to grant him medical leave for his serious mental illness and instead decided to terminate him, in violation of Upchurch's rights under 29 U.S.C. § 2615 of the FMLA.  Upchurch asserts that Mount Carmel was on both real and constructive notice of a need for time off of work for treatment that would have met the criteria of the FMLA, and would have qualified as a reasonable accommodation of his disability.

7

Mount Carmel argues that Plaintiff's claim of FMLA interference fails as a matter of law for three independent reasons: (1) the claim is untimely, as it was filed more than two years after Plaintiff's termination and he cannot establish a "willful" violation of the FMLA; (2) Plaintiff cannot establish essential elements of the claim, including that he gave Mount Carmel notice of his intention to take FMLA leave and that he was actually entitled to leave; and (3) Plaintiff admits that he would not have been able to return to work at the end of the leave with which he claims Mount Carmel interfered.

The FMLA entitles an employee to twelve workweeks of leave per year if the employee has a "serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). The Sixth Circuit recognizes both "interference" and "retaliation" theories of recovery against employees for noncompliance with the FMLA. Since Upchurch does not allege or argue retaliation, the Court need only address Upchurch's potential for recovery under the "interference" theory:

> The "entitlement" or "interference" theory arises from [29 U.S.C.] § 2615(a)(1), which states that "[i]t shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided in this subchapter," and from [29 U.S.C.] § 2614(a)(1), which provides that "any eligible employee who takes leave ... shall be entitled, on return from such leave (A) to be restored by the employer to the position of employment held by the employee when the leave commenced; or (B) to be restored to an equivalent position."

*Coffman v. Ford Motor Co.*, 719 F. Supp. 2d 856, 868 (S.D. Ohio 2010), *aff'd* 2011 U.S. App. LEXIS 23462 (6th Cir. 2011) (quoting *Arban v. West Pub. Corp.*, 345 F.3d 390, 400-01 (6th Cir. 2003)).

To prevail on his "interference" claim for violation of the FMLA, Upchurch must establish by a preponderance of the evidence that: (1) he was an eligible employee, as defined in 29 U.S.C. § 2611(2); (2) Mount Carmel is an employer, as defined in 29 U.S.C. § 2611(4); (3) he

8

was entitled to take leave for one of the reasons set forth in 29 U.S.C. § 2612(a)(1); (4) he gave

notice to Mount Carmel of his intention to take leave, as required by 29 C.F.R. §§ 825.302-.303;[1]

and (5) Mount Carmel denied him the benefits to which he was entitled under the FMLA and/or

used his FMLA leave time as a negative factor leading to adverse action.  *See Wysong v. Dow

Chem. Co.*, 503 F.3d 441, 447 (6th Cir. 2007); *Cavin v. Honda of America Mfg., Inc.*, 346 F.3d

713, 719 (6th Cir. 2003).

### 1.  Timeliness (Statute of Limitations Defense)

Mount Carmel claims Upchurch has not shown a "willful" violation of the FMLA, so his

claim is time-barred by the FMLA's two-year statute of limitations for claims of non-willful

violations.  Upchurch argues that Mount Carmel's failure to consider FMLA leave after

Upchurch "requested" time off of work on January 24, 2008 is sufficient to satisfy the

"willfulness" element, thus allowing the three-year statute of limitations to apply to his claim.

Plaintiff's employment at Mount Carmel ended on January 25, 2008, and he filed this lawsuit on

November 12, 2010—two years and roughly ten months later.  Under 29 U.S.C. § 2617(c) of the

FMLA, "an action may be brought under this section not later than 2 years after the date of the

last event constituting the alleged violation for which the action is brought," except for "actions

brought for a willful violation of [rights]," which "may be brought within 3 years of the date of

the last event constituting the alleged violation for which such action is brought."  29 U.S.C. §

2617(c)(1)–(2).

The FMLA does not define "willful," but the Sixth Circuit has held that "[a]n employer

commits a willful violation of the FMLA when it acts with knowledge that its conduct is

prohibited by the FMLA or with reckless disregard of the FMLA's requirements."  *Coffman*, 719

---

[1] 29 C.F.R. §§ 825.302 and 825.303 provide the employee notice requirements for foreseeable, and unforeseeable, FMLA leave, respectively.

F. Supp. 2d at 868 (quoting *Ricco v. Potter*, 377 F.3d 599, 602 (6th Cir. 2004)).  The determination of willfulness necessarily involves a factual inquiry; however, courts have held that the question of an employer's willfulness, or lack thereof, is an appropriate issue for summary judgment when justified by the record.  *See id.*

It is undisputed that Upchurch left his jobsite at Mount Carmel after simply declaring, "I can't do this today. It's all too much. I didn't sleep last night; It's more than I can do."[2]  Ms. Lemiesz reported the incident to Ms. Weatherholt, telling Ms. Weatherholt that Upchurch had left; he had said "he couldn't do this anymore;" and that she (Ms. Lemiesz) was extremely concerned about his welfare.  Ms. Lemiesz called Ms. Weatherholt to report the incident. (Lemiesz Tr. 77-78.)  Ms. Weatherholt immediately told Ms. Lemiesz to calm down, and stated that Upchurch had abandoned his job.  (Lemiesz Tr. 77-78.)  Ms. Weatherholt further ordered that Ms. Smith prepare a statement of her report of the incident.  Ms. Smith included in her statement the specific declarations Upchurch made as he left, (Joint Dep., Exh. 21.), but Ms. Weatherholt never reviewed Ms. Smith's statement before deciding to discharge Upchurch. (Weatherholt Tr. 49.)

When Ms. Lemiesz reached Upchurch by telephone later on January 24, 2008, Upchurch asked Ms. Lemiesz for some time off work, stating, "he was not able to do this anymore and that he needed some time."  (Lemiesz Dep. 84:23-85:3.)  Ms. Lemiesz "told him he could have that time" off, because she believed he needed time off "to attend to some of his concerns," i.e. mental health concerns.  (*Id.* at 85-86.)  Ms. Weatherholt ordered Ms. Lemiesz to escort Upchurch to Ms. Weatherholt's office if he returned.  (*Id.* at 88.)  When Upchurch arrived for work on January 25, 2008, Ms. Lemiesz escorted him to Ms. Weatherholt's office.  Ms.

---

[2] (Jnt Dep. Ex. 21.)

Weatherholt expressed to Upchurch that "she was concerned about him," but she terminated him for abandoning his position the day before.  (Lemiesz Dep. 89:4-13.)

Drawing all reasonable inferences in Upchurch's favor, Upchurch's FMLA claim is time-barred because there is no evidence of Mount Carmel's "willful" refusal to provide FMLA leave. First, there is no assertion by Upchurch that he at any time verbalized a request to Mount Carmel for FMLA leave.  Even if his subsequent request for "time off" because he "couldn't do this anymore" could reasonably be construed as a request for medical leave entitled to him under the FMLA, there is insufficient evidence to create a triable issue that Mount Carmel "knowingly" or with "reckless disregard" discharged him *because of that request*.  *See Coffman*, 719 F. Supp. 2d at 868.

Upchurch's evidence for showing willfulness is even less in his favor than the plaintiff's in *Coffman*.  On summary judgment in *Coffman*, this Court found that the plaintiff had "failed to put forward any evidence demonstrating that [employer] Ford knew its conduct was prohibited by the FMLA or that it acted with reckless disregard of FMLA requirements," where "she objected to Ford at the time of her termination that she [erroneously] believed she had submitted the necessary certifications and that her absences should have been excused."  *Id.* (concluding, "even if Coffman could establish that Ford erred in finding that particular absences were not excused pursuant to the FMLA, Coffman could not establish willfulness solely with evidence that Ford's determinations were negligent") (citing *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988) ("The word 'willful' . . . is generally understood to refer to conduct that is not merely negligent.")).

Unlike in *Coffman*, where the plaintiff actually stated "that she believed she had submitted the necessary certifications and that her absences should have been excused" under the

11

FMLA, *id*. at 868,  here Upchurch never discussed his need or desire to take FMLA leave with Mount Carmel.  Upchurch's actions confirm he did not intend on taking any FMLA leave when he left work, because he came back to Mount Carmel from his "time off" the very next day.

In defense of his "willfulness" claim, Upchurch points to Ms. Weatherholt's testimony that if Upchurch had not come to work at all on the morning of January 24th, rather than leaving after he had arrived for the day, she would not have terminated him for "job abandonment." (Doc. No. 24, p. 15.)  Upchurch presents this testimony to show Mount Carmel's intent to terminate him for reasons other than what it claims.  Further, Upchurch points to Ms. Weatherholt's failure to review Ms. Smith's written statement of his "abandonment" incident as evidence of her willful disregard for his request for FMLA-covered leave.  Upchurch argues that willfulness under the FMLA can be shown through a deliberate failure to consider an employee's request for time off of work that would potentially be FMLA-protected, relying on *Waites v. Kirkbride Ctr.*, Case No. 10-cv-1487, 011 U.S. Dist. LEXIS 55363 (E.D. Pa. 2011).

In *Waites*, the court did find that the plaintiff need not to "allege that she expressly requested FMLA leave," *id.* at *29; however there were a number of additional factors in *Waites* suggesting that the employer's behavior was an intentional effort to deny plaintiff the ability to receive her FMLA-required leave.  *See id* at *30 (where, *inter alia*, plaintiff "telephoned Mr. Collier about her illness and impending hospitalization" which constituted "an attempted invocation of the FMLA" and "within three days of being told to contact the Human Resources Department regarding doctor's notes and FMLA leave, Defendant prohibited Plaintiff from entering the building").  Unlike in *Waites*, where the employer "made Plaintiff's attempts at communication difficult," here, Ms. Lemiesz and Ms. Weatherholt made multiple attempts to

contact *Upchurch*, giving him plenty of opportunities to invoke the FMLA and put them on notice as required for willfulness.

Upchurch merely stating that he "needed some time off" is insufficient by itself to support a claim that Mount Carmel's terminating him for walking away from the job was done willfully to avoid granting his FMLA leave, even when his supervisors knew he had mental health issues and were "concerned" about his well-being.  Upchurch returned to work the next day, and at that time did not give any indication that he wanted, needed, or demanded FMLA leave.  Even if Ms. Lemiesz and Ms. Weatherholt erroneously failed to determine that his mental condition warranted FMLA leave, there is no evidence that such a failure was anything more than "negligence."  *See Coffman*, *supra*, 719 F. Supp 2d. at 868.  Even the *Waites* Court recognized that, "[a] plaintiff must do more than show that his 'employer knew [the FMLA] was in the picture,' because such a low standard would 'obliterate any distinction between willful and nonwillful violations.'"  *Id.* at *28 (quoting *McLaughlin*, 486 U.S. at 132); *see also Wilmath v. St. Joseph Mercy Health Center*, No. 08-6011, 2009 WL 77616, at *3 (W.D. Ark. Jan. 9, 2009) (holding, "[t]o create a genuine issue of material fact that a violation was willful . . . [t]hat the employer should have known that its actions would violate the FMLA is insufficient").

In sum, there is insufficient evidence to create a triable issue of fact on a willfulness FMLA interference claim, which renders Upchurch's claim time-barred under 29 U.S.C. § 2617(c)'s two-year statute of limitations for non-willful violations of the FMLA.  Upchurch has "failed to put forward any evidence demonstrating that [Mount Carmel] knew its conduct was prohibited by the FMLA or that it acted with reckless disregard of FMLA requirements."  *Coffman*, 719 F. Supp at 868.  Mount Carmel's termination of Upchurch may have been unfair,

or even negligent, but there is no evidence that it was done willfully upon a request by Upchurch for FMLA leave.

### 2.  Upchurch Could Not Have Returned to Employment after his Twelve-Week Leave

In Mount Carmel's second basis for denying Upchurch's FMLA claim, it argues that even if Plaintiff's FMLA claim was timely, and even if Plaintiff could establish the elements of that claim, his FMLA claim would still fail as a matter of law because it is undisputed that Plaintiff would not have been able to return to work after the twelve weeks of leave he claims Mount Carmel improperly denied him.

It is well-established in the Sixth Circuit that "a company does not violate the FMLA when it terminates an employee who is incapable of returning to work at the end of the 12-week leave period allowed by the Act." *Edgar v. JAC Products, Inc.*, 443 F.3d 501, 511 (6th Cir. 2006) (citing *Cehrs v. Northeast Ohio Alzheimer's Research Center*, 155 F.3d 775, 784-85 (6th Cir. 1998)).  The reason behind this legal defense to FMLA violation is that "[o]nce the 12-week period ends . . . employees who remain 'unable to perform an essential function of the position because of a physical or mental condition . . . [have] no right to restoration to another position under the FMLA.'"  *Id.* at 507 (quoting 29 C.F.R. § 825.214(b)).  Employers in FMLA interference (also called, "entitlement") cases, such as this one, may rely on this "*Cehrs*" defense "even if the medical evidence on which they rely did not emerge until after the employment decision occurred."  *Id.* at 512.

Upchurch does not refute, deny, or even address Mount Carmel's defense to liability under *Cehrs*.  Because this technically concedes the issue, *see Celotex*, 477 U.S. at 324, and because the evidence indeed shows that Upchurch could not have returned within his 12-week time period, the FMLA claim fails under *Cehrs* as well.

14

> In examining the employee's ability to return to work, courts faced with a *Cehrs*-based motion for summary judgment in an entitlement case should consider all of the medical evidence bearing on the employee's ability to timely return, not just the evidence available at the time of the adverse employment action.

*Edgar*, 443 F.3d at 512.

The FMLA benefit at issue in his claim is the twelve weeks of leave for "serious medical condition" under the Act.  (Opp. at 10-11.)  The "serious health condition" that Upchurch alleges rendered him unable to work is "late onset schizophrenia," which allegedly manifested itself in the form of voices that Upchurch heard and believed to be "Him"—i.e. God or Jesus.  (*See* Opp. at 10-11).   Upchurch testified that he continued hearing the voices until December of 2008—eleven months after his termination.  (Pl. Dep. 94).  Upchurch admitted that he was not able to work as a chaplain until approximately April or May of 2011—over three years after his termination in January of 2008.  (*Id.* 98-99.)[3]

Upchurch's own testimony establishes that he would have been incapable of returning to work at the end of the twelve-week FMLA leave period following his discharge from Mount Carmel.  Under the rule in *Cehrs*, Mount Carmel is entitled to summary judgment on Plaintiff's FMLA claim on that basis alone.  *See Edgar*, 443 F.3d at 511.

---

[3]     Q. This may be difficult to pinpoint, but is there a time when you -- or can you identify a time when you believe you regained the ability to work as a chaplain?

UPCHURCH. I would say over the last year.

Q. Okay. So sometime during 2011?

UPCHURCH. Yeah.

Q. And can you be more specific in terms of when during 2011?
A. Oh, I'd say March or April.

Q. Was there anything that happened around that time that made you feel that you were improved or at a new level of achievement?

UPCHURCH. Just lessened anxiety and my confidence in my abilities returning.

Pl. Dep. 98:5-19.

### 3.  Merits of the FMLA claim

On the merits, Mount Carmel argues that Upchurch's FMLA claim fails to satisfy two required elements even for non-willful violation: (1) he cannot establish that he gave notice of his intention to take leave; and (2) he cannot establish that he was entitled to leave under the FMLA.  *See Wysong*, *supra*, 503 F.3d at 447.  The merits of the FMLA claim need not be addressed, however, because of the statute of limitations, discussed *supra*, Section IV.A.1, and the bar to his FMLA entitlement claim under Mount Carmel's "*Cehrs*" defense, discussed *supra*, Section IV.A.2.

Even if it were necessary to reach the merits of the FMLA claim, Upchurch would have difficulty showing a triable issue that he gave notice of his intention to take FMLA leave, the third required element for his claim.  *See Wysong*, 503 F.3d at 447; *see also Brohm v. JH Properties, Inc.*, 149 F.3d 517, 523 (6th Cir. 1998) (holding, on the notice requirement, "[t]he critical question is whether the information imparted to the employer is sufficient to reasonably apprise it of the employee's request to take time off for a serious health condition").  Plaintiff admits he never asked for medical leave for his mental illness:

> Q. . . . You never asked them to take a leave of absence because of a mental illness; is that correct?
>
> A. (Plaintiff). That's correct.

(Pl. Dep. 61.)

### B.  State Law Disability Discrimination

Upchurch claims that Mount Carmel violated Ohio's antidiscrimination law by allegedly "discharging him because of a demonstrated disability."  (Compl. ¶ 33.)  Upchurch claims unlawful discrimination by Mount Carmel for being terminated because of his mental disorder, subsequently diagnosed as schizophrenia by Dr. Hartman.  (Pl. Dep. 87.)  Mount Carmel

16

contends Upchurch's disability discrimination claim fails as a matter of law because: (1) no evidence exists that Plaintiff was disabled at the time of his termination, or that Mount Carmel knew he was disabled; and (2) the undisputed facts show that Plaintiff was terminated for abandoning his job, not because of any disability.

> Ohio Rev. Code § 4112 provides that it shall be an unlawful discriminatory practice:
>
> (A) For any employer, because of the . . . disability . . . of any person, to discharge without just cause, to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment.

Ohio Rev. Code § 4112.02(A).

To prevail on a claim of disability discrimination under Ohio law, a person must establish: "(1) that he was handicapped; (2) that an adverse employment action was taken by an employer, at least in part, because the individual was handicapped; and (3) that the person, though handicapped, can safely and substantially perform the essential functions of the job in question." *Taylor v. Ohio Dept. of Job & Family Servs*., No. 11AP-385, 2011 WL 5878335, at *5 (Ohio Ct. App. 2011); *see also Columbus Civ. Serv. Comm. v. McGlone*, 697 N.E.2d 204 (Ohio 1998).  Ohio courts have held that "[t]he ADA, the Rehabilitation Act, and R.C. 4112.02 are governed by similar standards." *Id.*; *see also Plumbers & Steamfitters Jt. Apprenticeship Comm. v. Ohio Civil Rights Comm.*, 66 Ohio St. 2d 192, 196 (1981).  Upchurch defends his claim under the required elements formulated in ADA cases, which are:

> (1) []he has a disability; (2) []he was qualified for the job; and (3) []he either was denied a reasonable accommodation for h[is] disability or was subject to an adverse employment decision that was made . . . because of h[is] disability.

*Roush v. Weastec, Inc.*, 96 F.3d 840, 843 (6th Cir. 1996).  For the third element of proving discriminatory intent, the familiar Title VII burden-shifting analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) is applicable for showing indirect discrimination.  *See*

*Walker v. Consolidated Biscuit Co.*, 116 F.3d 1481 (6th Cir. June 26, 1997); *Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 882 (6th Cir. 1996).

### 1.  Whether Mount Carmel Knew Upchurch had a Disability

There is a genuine issue of material fact as to whether Upchurch's mental illness exhibited during his employment constituted an eligible "disability."  The ADA and Ohio law both specifically include mental illness as a disability.  42 U.S.C. § 12102(2); Ohio Rev. Code. § 4112.02(A)(16)(a).  The ADA and applicable federal regulations "define 'physical or mental impairment' as 'any physiological disorder, or condition' affecting one or more of various body systems."  *Roush*, 96 F.3d at 843 (quoting 29 C.F.R. § 1630.2(h)(1)).  Courts have determined that someone suffering psychotic episodes due to schizophrenia is a disabled person under this standard.  *See, e.g.*, *Bultemeyer v. Ft. Wayne Community Schools*, 100 F.3d 1281, 1284 (7th Cir. 1996).

Even though Upchurch was not formally diagnosed with schizophrenia until after being terminated, a jury could find on the facts of his extreme delusional and erratic behavior that the impairment affected him prior to diagnosis and "substantially limited at least one of his major life activities."  *Rhoads v. Bd. of Educ. of Mad River Loc. Sch. Dist.*, 103 F. App'x 888, 892-93 (6th Cir. 2004).  (stating, at n.2, "'under both federal regulations and Ohio code, a "disability" is an impairment, physical or mental, which substantially limits one or more of an individual's major life activities, a record of such impairment, *or being regarded as one having such an impairment*'") (quoting *Ferguson v. Lear Corp.*, 802 N.E.2d 1141, 1148 (Ohio Ct. App. 2003)) (emphasis added).

Slightly more difficult for Upchurch is the additional requirement within this element—that Mount Carmel must have *known* of his disability.  *See id.*  The Sixth Circuit has held that

"the defendant cannot discriminate 'because of' a disability if it has no knowledge of the disability." *Kocsis*, 97 F.3d at 884.  Mount Carmel contends that it had no knowledge that Plaintiff suffered from any disability at the time of his termination.  (Motion, at 19.)  Mount Carmel points to Upchurch's deposition testimony, where he admitted that he never informed anyone at Mount Carmel that he suffered from a mental illness, (Pl. Dep. 61) and that at the time of his termination, Upchurch did not believe that he suffered from any mental illness, and had not been diagnosed with any mental illness, (Pl. Dep. at 55, 59, 60, 86).

The evidence viewed in the light most favorable to Upchurch is sufficient to create a triable issue that Mount Carmel knew he had a disability.  Mount Carmel knew he had a mental health issue, which is evidenced by its placing him on administrative leave and sending him on an EAP referral to be evaluated by Dr. Tennenbaum.  While Dr. Tennenbaum did not diagnose Upchurch with schizophrenia then, he did report that Upchurch had "delusional thoughts" and most likely a "personality disorder."  (Tennenbaum Consult, Jnt. Dep. Ex. 12, at 5.)  Moreover, Ms. Weatherholt and Ms. Lemiesz testified that Upchurch had become a completely different person and had concerns for his mental well-being.  (Weatherholt Tr. 65); *See Kocsis*, 97 F.3d at 884 (holding, an "'individual with a disability' also includes persons who have impairments that are not substantially limiting, but who are regarded by their employer as being substantially limited") (citations omitted in the original).

### 2.  Whether Mount Carmel's Basis for Upchurch's Discharge was his Disability

Mount Carmel does not dispute that Upchurch was qualified for the position of chaplain, or at least that he would have been with adequate accommodation.  *See* Taylor, 2011 WL 5878335, at *5.  Rather, Mount Carmel contends that Upchurch has failed to show any evidence of a causal connection between his disability and his termination for leaving work.  First, Mount

19

Carmel argues that even if his behavior was a result of his mental health issues, "an employer may fire a person for his conduct even if that conduct is related to the employee's disability." *Brohm v. JH Properties, Inc.*, 149 F.3d 517, 521 (6th Cir. 1998).  Second, Mount Carmel argues no evidence in the record shows that the conduct for which Upchurch was terminated—abandoning his work and not reporting to his supervisor—was caused by any disability.

Mount Carmel's asserted basis for terminating Upchurch is job abandonment based on his leaving his workplace on January 24, 2008 without explanation and not returning until the next day.  Upchurch essentially argues that Mount Carmel's basis was pretextual, (*see* Opp. at 17), as Mount Carmel's employment policy expressly prescribes that involuntary termination for "job abandonment" may occur after "two (2) consecutive scheduled days" of an employee's absence without notifying his or her manager.  (Weatherholt Tr. 58-59; Jnt Dep. Ex. 26.)  Moreover, Ms. Weatherholt testified that had Upchurch not shown up nor called in on January 24, 2008, and then shown up on January 25, 2008 the same as he actually did, he would not have been terminated for job abandonment.  (Weatherholt Tr. 59)

### a.  *Prima facie case*

Without any direct evidence of discrimination, an ADA discrimination plaintiff must rely on indirect proof of discriminatory intent, as shown under the *McDonnell Douglas* burden shifting scheme.  In addition to the three elements already established for Upchurch's prima facie case of disability discrimination, i.e. that "(1) []he was 'disabled' within the meaning of the Act; (2) []he was qualified for the position, with or without an accommodation; [and] (3) []he suffered an adverse employment decision with regard to the position in question."  *Kocsis*, 97 F.3d at 882.  Upchurch must also establish that:  "(4) a non-disabled person replaced h[im] or was selected for the position that the disabled person had sought."  *Id.*

Only if the plaintiff establishes the elements for a prima facie case does the burden then shift to the employer to set forth a legitimate, nondiscriminatory reason for the adverse employment action it took against the plaintiff.  *See id.* (citing *McDonnell Douglas*, 411 U.S. at 802).  Finally, "[i]f the defendant carries that burden of production, plaintiff must then prove 'by a preponderance of the evidence' that the defendant's proffered reasons were not its true reasons, but were merely a pretext for illegal discrimination." *Id.* (quoting *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248 (1981)).  (adding, "[m]ore specifically, a plaintiff must produce enough evidence that a jury could reasonably reject the employer's explanation for its decisions").

Mount Carmel claims Upchurch has not met the fourth element of his prima facie case, as he has not identified any "non-disabled" employees who engaged in similar conduct but were not terminated or treated more favorably than he was.  Mount Carmel is correct in this contention.  Upchurch does not point to any evidence, nor is any apparent from the record, of Mount Carmel treating similarly-situated chaplains more favorably.  There were five other chaplains at Mount Carmel East hospital.  (Lemiesz Tr. 18.)  No allegations are made, however, that any of them was treated more favorably or was not terminated under similar circumstances.  Nor does Upchurch allege any facts that he was replaced by a non-disabled person, *see Kocsis*, 97 F.3d at 882 (although this is statistically likely).  Upchurch cannot meet the elements for a prima facie case of indirect discrimination.

### b. Direct evidence of discriminatory basis for termination

Upchurch does not make much of an attempt to prove his claim under the *McDonnell Douglas* framework, however, despite acknowledging its applicability to his Ohio law discrimination claim.  (Opp. at 16.)  Upchurch instead argues that Mount Carmel took advantage

21

of its desire to discriminate against him by unnecessarily discharging him for "job abandonment" rather than providing him the help and leave he needed for overcoming his disability. Instead of giving him the time off he requested and the chance to find out what was really wrong with him, argues Upchurch, Ms. Weatherholt terminated Upchurch for job abandonment. (Lemiesz Tr. 94.) According to Upchurch, "[i]t is apparent that Weatherholt had decided that the [mental health] problems of a 20-year employee paled in comparison with the relief MCHS would have at being rid of him (and rid of 'Him')." (Opp. at 18.) This attitude by Mount Carmel, he claims, constituted disability discrimination.

To survive summary judgment Upchurch must show a genuine issue of fact exists "that an adverse employment action was taken by [Mount Carmel], at least in part, because [he] was handicapped." *Taylor*, 2011 WL 5878335 at *5. The ADA "defines discrimination to include 'not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability.'" *Talley v. Family Dollar Stores of Ohio, Inc.*, 542 F.3d 1099, 1108 (6th Cir. 2008) (citing 42 U.S.C. § 12112(b)(5)(A)). Direct evidence of discrimination is evidence that "if believed, *requires* the conclusion that unlawful discrimination was at least a motivating factor" in the adverse employment action." *Bartlik v. United States Dept of Labor*, 73 F.3d 100, 103 n.5 (6th Cir. 1996) (citations omitted) (emphasis added) ("Direct evidence of discrimination is rare because employers generally do not announce that they are acting on prohibited grounds.").

Upchurch supports his claim of Mount Carmel's discriminatory intent with the following evidence: (1) Ms. Lemiesz had concluded that because of the delusions and behavior he

displayed, he could no longer do his job;[4] (2) Ms. Weatherholt discussed Upchurch with Dr.
Tennenbaum and he told her in his opinion Upchurch would be out of Mount Carmel very soon,
but "it wouldn't be easy," (Weatherholt Tr. 34.); (3) Ms. Weatherholt was aware, but ignored the
diagnosis from Dr. Tennenbaum that Upchurch was "delusional" (*Id.* 33:11-18, 36:16-17); (4)
Ms. Weatherholt did not tell Ms. Lemiesz Upchurch was delusional, only "manipulative."
(Lemiesz Tr. 104-05.); and (5) Ms. Weatherholt admits that the Mount Carmel's "job
abandonment" policy did not per se require her to terminate Upchurch, and that she fired him
"because he left" in the way that he did.  (Weatherholt Tr. 59-60.)

  Viewing the evidence in Upchurch's favor, Upchurch's supervisors knew he had a
serious mental problem affecting his ability to continue working.  A generous interpretation of
the evidence in Upchurch's favor suggests further that Ms. Weatherholt viewed his behavior
resulting from his disability as "manipulative," and she wanted to use his abandonment as an
opportunity to get rid of Upchurch.  Finally, the evidence could support the reasonable
conclusion that Ms. Weatherholt failed to take steps following his return from administrative
leave to accommodate his disability.  But none of the facts or testimony constitutes *direct*
evidence "requiring" the conclusion that his supervisors' intent was to discharge him and/or not
accommodate him due to his schizophrenic behavior.  A discriminatory intent to not
accommodate him is merely a *reasonable inference* that one might draw from the evidence.  The
Court already established, *supra*, that Upchurch cannot satisfy the test for indirect evidence of
discrimination under the *McDonnell Douglas* scheme.

---

[4] Ms. Lemiesz stated that Upchurch, in the condition he was in at the time, could not perform the job of chaplain.
(Lemiesz Tr. 15-16, 96-98), and, that Upchurch suddenly "has no concept of what a professional chaplain does
anymore, and basically operates out of a framework of what 'He' tells him to do." (*Id.* 15-16; Jnt. Dep. Ex. 1).

A court could find that Upchurch has "presented sufficient evidence from which a jury could find that h[is] failure to return to work and eventual discharge was a foreseeable and intended result of the company's action." *Talley*, 542 F.3d at 1109.  In *Talley*, the plaintiff had a qualifying disability requiring the accommodation of a stool, which she had requested repeatedly but was denied by the employer.  *See id.* at 1108.  The court found further that "[t]he defendants have not set forth specific facts indisputably demonstrating that the use of a stool would have presented an undue hardship for the company."  *Id.*  The Sixth Circuit reversed summary judgment against plaintiff,  reasoning, "[a]ssuming that Talley was denied a reasonable accommodation that forced her to work in excess of her medical restrictions, a reasonable jury could infer that the defendants knew that Talley's working conditions would become intolerable to a reasonable person suffering from her particular disability."  *Id.*

Even under *Talley*, however, Upchurch does not have enough evidence to support a "constructive discharge" claim on the theory that Mount Carmel's actions constituted a foreseeable failure to accommodate.  First, unlike in *Talley*, Upchurch did not make repeated requests for accommodation of a disability—he merely requested *once* that he be given "time off" because he "couldn't do this anymore."  (Jnt. Dep. Exh. 26.)  Second, unlike in *Talley* where the employer's attempts to negotiate accommodation had broken down into a "complete failure to accommodate" her, *see Talley*, 542 F.3d at 1109, Mount Carmel had just recently taken steps to help Upchurch, by granting him administrative leave and referring him for psychiatric testing. The court in *Talley* tempered its holding, providing the following limits:

> We emphasize that our holding today does not pave the way for an employee to assert a claim for constructive discharge every time an employer fails to accommodate her disability. But when an employee makes a *repeated* request *for an accommodation* and that request is both denied and no other reasonable alternative is offered, a jury may conclude that the employee's resignation was both intended and foreseeable.

24

*Talley*, 542 F.3d at 1109 (emphasis added).

Mount Carmel' failure to accommodate Upchurch was neither "a complete failure," nor was it done "in the face of repeated requests."  *See id.*  Having failed to make the requisite showing of discriminatory intent or foreseeable lack of accommodation on the part of Mount Carmel, and having failed to establish a prima facie case of discrimination, Upchurch's disability discrimination claim fails as a matter of law.

## V.  CONCLUSION

Upchurch's FMLA claim fails as a matter of law under 29 U.S.C. § 2617(c)'s applicable two-year statute of limitations.  His FMLA claim also fails under the rule in *Cehrs* because the evidence establishes that Upchurch was not able to return to work at Mount Carmel after 12 months.  Finally, Upchurch's disability discrimination claim fails, under all applicable theories of recovery under the ADA and Ohio law.  For these reasons, Mount Carmel is entitled to summary judgment on all Upchurch's remaining claims, and their motion for summary judgment is **GRANTED**.  The case is hereby **DISMISSED**.

**IT IS SO ORDERED.**

_    s/Algenon L. Marbley__
Algenon L. Marbley
United States District Judge

**Dated: September 4, 2012**

25